*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

**S T A T E   O F   M I C H I G A N**

**C O U R T   O F   A P P E A L S**

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

PAUL WENDELL RUSS,

Defendant-Appellant.

UNPUBLISHED
February 13, 2026
10:05 AM

No. 373384
Wayne Circuit Court
LC No. 84-004677-01-FC

Before: BOONSTRA, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

This case is before this Court as on leave granted following remand from our Supreme Court.[1] In 1985, a jury convicted defendant of murdering Leonard Perry on the night of August 6, 1984. Defendant was sentenced to life in prison without the possibility of parole, and defendant's conviction and sentence were affirmed on appeal. *People v Russ*, unpublished per curiam opinion of the Court of Appeals, issued March 1, 1988 (Docket No. 84976). In 2023, defendant moved for relief from judgment, arguing that he recently discovered evidence which, had it been presented at his trial, would likely have led the jury to acquit him of Perry's murder. That new evidence was an affidavit signed by James Jackson—who was dating defendant's sister at the time of Perry's murder—in which Jackson averred that he was in the car with Perry when he was shot and killed, and Jackson identified the shooter as someone other than defendant. Following an evidentiary hearing in which the trial court heard from Jackson and the private investigator who obtained Jackson's affidavit, the court denied defendant's motion in a written order. The court concluded that defendant satisfied the first three *Cress*[2] factors but not the fourth. While the court found that Jackson's testimony was not patently incredible, the court nevertheless concluded that Jackson's testimony would not make a different result on retrial probable when considered alongside the other evidence that would be presented on retrial, in part because the impact of Jackson's testimony would be seriously diminished given the incredible nature in which the testimony came about.

---

[1] *People v Russ*, ___ Mich ___; 20 NW3d 585 (2025).

[2] *People v Cress*, 468 Mich 678; 664 NW2d 174 (2003).

Defendant appeals from this ruling, arguing that the trial court erred by considering Jackson's credibility when determining whether Jackson's testimony would make a different result on retrial probable because the court had already determined that Jackson's testimony was not patently incredible. This was especially true, defendant contends, because the witness who placed defendant at the scene had issues identifying defendant. Concluding that the trial court did not abuse its discretion when it denied defendant's motion for relief from judgment, we affirm.

## I. BACKGROUND

Perry was shot and killed on the night of August 6, 1984, while riding in the passenger seat of a vehicle driven by Maurice Kirk. Kirk testified about the circumstances of the shooting at defendant's trial. According to Kirk, he went to a party store at around 11 p.m. on the night of the shooting. When Kirk came out of the store, Perry was standing by his car, and Kirk let Perry into the passenger seat of Kirk's car while Kirk got into the driver's seat. Around the same time, Kirk saw defendant driving his car by the party store with someone in the passenger seat whom Kirk could not identify. Kirk recognized defendant and his car because Kirk had known defendant for eight or nine years, they lived in the same neighborhood, and Kirk saw defendant "probably 200 times during the year" and saw defendant's "car on a consistent basis probably daily." Kirk watched as defendant drove his car past the party store, then made a U-turn and drove past the party store again. As Kirk continued watching, defendant stopped his car, got out, and grabbed "a long barrel gun" out of his trunk.[3] At that point, Perry said, "Get the hell out of here," and Kirk shifted his car into gear and drove off. Perry and defendant had an ongoing dispute about Perry's relationship with defendant's girlfriend that had resulted in defendant attacking Perry on two prior occasions. Kirk testified that, about one year before Perry's murder, Kirk witnessed defendant "attempt to run [Perry] down" with his car, and Perry's brother testified that he had witnessed defendant shoot at Perry with a rifle.

Kirk testified that, as he drove, he saw defendant's car following them, so Kirk tried to get away by driving over 60 miles per hour and going through two red lights. As Kirk continued driving, he "heard glass breaking and a loud shattering noise" as "[a] shot came through the back window" of his car. The shot coming through the back window caused Kirk to lose control of his car, and Kirk "ran the car up on the curb." Kirk looked over and saw Perry "slumped over," then he got out of the car and ran. When Kirk looked back, he saw defendant's car stopped next to Kirk's car and saw defendant—in the passenger seat of his car with an unidentified person driving—looking into Kirk's car. After defendant's car left, Kirk went back to his car to check on Perry. When he saw that Perry had his eyes closed and was slumped over, he yelled for someone to call an ambulance.

Police arrived, and Kirk gave a statement. He told officers that he knew "the assailant," and he "gave them a street that [he] thought that the defendant lived on and a description of the car." The officer who spoke to Kirk at the scene confirmed that Kirk gave him a

---

[3] Kirk was later asked if he could identify any other characteristics about the firearm, such as if it was a shotgun, and Kirk said that he could not.

description of a vehicle (which matched the description of defendant's vehicle) and said that there were two occupants in the car, with "one of them carrying a weapon, a rifle."[4] The officer also testified that Kirk told him that one of the occupants "had a girlfriend that lived" near the party store that Kirk just came from, and other testimony confirmed that defendant's girlfriend at the time lived near the party store where Perry got into Kirk's car.

A medical examiner removed "one slug" and "copper jacket fragments from the slug" from Perry's head.[5] The slug and jacket fragments were examined, and it was determined that the slug was a .30-caliber bullet fire from an "M-1 Military Style Carbine," which is "a rifle" that is "about 32 inches long, 30 inches long."

On the basis of the information received at the scene of the shooting, officers went to defendant's street on the night of August 6, 1984, and stayed "planted" on defendant's home into the early morning hours of August 7, 1984, trying to locate the vehicle that was described to them. Officers testified that they watched the home from 11:20 p.m. on August 6 to 1:45 a.m. on August 7, but they left because the vehicle they were looking for was not there. Officers returned to the area about an hour later, and this time they saw defendant's car parked on the street and three individuals sitting on the front porch of defendant's home. One of the officers recognized defendant as one of the individuals on the porch. Upon seeing the officers, the individuals went inside. When officers attempted to apprehend defendant, they were refused entry into his home, and those inside barricaded the door while defendant fled through a window. Defendant's car was then seized and impounded by the officers.

On August 8, Kirk tentatively identified defendant in a photo lineup as the "one originally driving and he's the one that got out of the car and got the rifle from the truck and got back in the passenger side." Kirk said that he was "85 per cent sure that" defendant was the person he saw that night, and he "would know for sure when" he was able to see defendant "in person." Also on August 8, Kirk identified defendant's car as the vehicle involved in the chase.

Defendant later turned himself in, and on August 16, 1984, he participated in a live line-up in which Kirk initially identified the perpetrator of the August 6 shooting as someone other than defendant. After an officer spoke with Kirk, Kirk said that he purposefully picked the wrong person, and he then identified defendant as the perpetrator of the shooting.[6]

---

[4] Other evidence at defendant's trial suggested that Kirk told officers that he did not see a gun on the night of the shooting.

[5] The medical examiner testified that Perry died from "a single gunshot wound to the head which penetrated his brain."

[6] Defendant on direct appeal argued that the live lineup in which Kirk identified defendant was unduly suggestive, and the prosecution conceded that the lineup was suggestive because of the officer's remarks to Kirk following his initial identification of someone other than defendant. *Russ*, unpub op at 1. As this Court explained, however, on defendant's motion, the trial court had held a hearing consistent with *United States v Wade*, 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149

The jury convicted defendant of first-degree murder and assault with intent to commit murder, and he was sentenced to life imprisonment without the possibility of parole for the murder conviction, and 10 to 20 years' imprisonment for the assault conviction.

In 2023, defendant filed a motion for relief from judgment and requested an evidentiary hearing.[7] Defendant attached to the motion an affidavit signed by Jackson and prepared by private investigator Scott Lewis Mischnick. In this affidavit, Jackson averred that he was in Kirk's car with Perry and Kirk on the night of the shooting. While the three of them were in Kirk's car in the parking lot of the party store, Kirk and Perry got into an argument with a man named Keith Johnson about some drugs that Perry had sold to Johnson. Jackson attested that, during the argument, Johnson "retrieve[d] a rifle from the trunk" of his red and white Buick, and after more words were exchanged, Kirk drove off, and Johnson followed in his Buick. A chase ensued, during which, according to Jackson, "the rear window was shattered with a shotgun blast." Afterwards, Jackson saw Perry "slumped over," and there was blood. Jackson fled from the car and ran home, where he told his mother and brother about the shooting, and his mother told Jackson to "keep [his] mouth shut." Jackson explained that he did not immediately come forward with this evidence because he was afraid of Johnson and what he would do to Jackson and his family. Jackson averred that he was dating defendant's sister at the time and later had four children with her, but he said

_____

(1967), after which the court "concluded that Kirk's identification of defendant was supported by an independent basis sufficient to purge the taint of the suggestive lineup." *Russ*, unpub op at 1-2. This Court agreed with the trial court's conclusion because Kirk testified that he had known "defendant for 8 to 9 years," they "lived in the same neighborhood," and "Kirk estimated that he had observed defendant approximately 200 times per year during this 8 or 9-year period." *Id*. at 2. This Court further reasoned that Kirk "observed the offense and the events leading up to the offense from a vantage point sufficient to allow him to make an identification." *Id*. This Court also agreed with the trial court's finding "that Kirk's failure to identify defendant . . . was intentional and was prompted by threats made both against him and his mother." *Id*. at 3. "The trial court noted at the *Wade* hearing that Kirk appeared with a broken leg which Kirk attributed to an assault by an unidentified person who warned him against putting his nose where it didn't belong." *Id*.

[7] This was defendant's second motion for relief from judgment; defendant's first motion was denied on May 30, 1997. While the trial court mistakenly referred to the current motion as "defendant's first for relief from judgment," that mistake does not make a difference under the circumstances. The court later found that Jackson's testimony constituted newly discovered evidence, so this second motion for relief from judgment is not procedurally barred because MCR 6.502(G)(2)(b) permits a successive motion for relief from judgment on the basis of "a claim of new evidence that was not discovered before the first such motion was filed." See also *People v Allen*, ___ Mich App ___, ___; ___ NW3d ___ (2026) (Docket No. 373427); slip op at 5 (explaining that "to overcome MCR 6.502(G)(2)'s procedural hurdle relative to a successive motion for relief from judgment based on a claim of new evidence (and for which the trial court has not waived the provisions of MCR 6.502(G) on the basis of the defendant's innocence), a defendant need only make some offer of proof that the evidence in question 'was not discovered before' the defendant filed his or her first motion for relief from judgment").

that he never revealed to her that he knew that defendant was innocent because it "never came up."[8]  Jackson explained that he was coming forward now after defendant "wrote [him] a letter."

At the evidentiary hearing, Jackson testified mostly consistent with his affidavit.  The court asked Jackson if he knew whether Johnson was still alive or what happened to him since Perry was killed, and Jackson said that he did not know.  The court further inquired as to when Jackson stopped being afraid to come forward and say that it was Johnson who killed Perry, and Jackson said that he did not know.  The letter that defendant had sent Jackson was then read into the record.  In that letter, defendant wrote that Jackson's daughter told defendant that Jackson was "there when this crime happened," and Jackson confirmed that he told this to his daughter, saying, "I had to."

Mischnick testified at the hearing and confirmed that he prepared Jackson's affidavit and had Jackson sign it.  After the affidavit was notarized, Mischnick mailed a copy to defendant.  Mischnick later received a letter from defendant in which defendant expressed concern about a paragraph in Jackson's affidavit in which Jackson averred that he came forward after defendant wrote him a letter.  Mischnick did not change the affidavit, and that paragraph remained.

On November 8, 2024, the trial court issued a lengthy written order denying defendant's motion for relief from judgment.  The court found that that Jackson's testimony constituted newly discovered evidence; it was not cumulative to other evidence admitted at defendant's trial; and it could not have been produced at defendant's trial through the exercise of reasonable diligence.  As for whether Jackson's testimony would make a different result reasonably probable on retrial, the trial court first considered whether Jackson's testimony was patently incredible and found that it was not.  The court reasoned that, while "the manner in which this evidence came about is incredible," the testimony itself was not patently incredible because it was "largely consistent with the testimony elicited at trial."  Nevertheless, the court held that, when considering Jackson's testimony in conjunction with the other evidence at defendant's trial, a different result would not be reasonably probable on retrial.  The trial court explained that, when considering this issue, it "carefully considered Mr. Jackson's testimony in conjunction with the evidence that was submitted at the defendant's trial."  And the court found that Jackson's testimony would not make a difference on retrial because, while it "would be divergent from" Kirk's testimony, other evidence made it more likely that defendant killed Perry, such as the evidence that "defendant had an ongoing dispute with [Perry] and had twice attempted to harm him before the shooting," and the fact that "when police attempted to arrest the defendant the door to the home was barricaded and the defendant fled."  The court then reiterated the serious problems with the manner in which Jackson's testimony came about and concluded, "Considering all of these factors together with the evidence that was submitted at trial, the testimony of Mr. Jackson would not make a different result probable on retrial."

This appeal followed.

---

[8] Defendant's sister testified at defendant's trial that she had defendant's car on the night of the shooting.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for relief from judgment is reviewed for an abuse of discretion. *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). A court abuses its discretion if "it makes an error of law or when its decision falls outside the range of reasonable and principled outcomes." *People v Owens*, 338 Mich App 101, 113; 979 NW2d 345 (2021). Findings of fact are reviewed for clear error. MCR 2.613(C). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017). While this standard is deferential, appellate courts should not "tacitly endorse obvious errors under the guise of deference." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018) (quotation marks and citation omitted).

## III. ANALYSIS

Defendant moved for relief from judgment on the basis of newly discovered evidence. To be entitled to relief on such a claim, a defendant must satisfy four factors: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003) (quotation marks and citation omitted).

At issue in this appeal is the trial court's finding as to the fourth factor.[9] When determining "whether newly discovered evidence makes a different result probable on retrial, a trial court must first determine whether the evidence is credible." *Johnson,* 502 Mich at 566-567. In so doing, the trial court must be mindful that "it is not the ultimate fact-finder," so the relevant inquiry is "whether a *reasonable juror* could find the testimony credible on retrial." *Id*. at 567. This requires a holistic view of the witness that considers "all relevant factors tending to either bolster or diminish the veracity of the witness's testimony." *Id*. If no reasonable juror "would consciously entertain a reasonable belief in the witness's veracity, then the trial court should deny a defendant's motion." *Id*. at 568. But "if a witness is not patently incredible," *id*. the court must go on to "consider the impact of that [witness's] testimony in conjunction with the evidence that would be presented on retrial," *id*. at 571.

The trial court here found that, while "the manner in which [Jackson's testimony] came about is incredible," the testimony itself was not patently incredible. The prosecution argues on appeal that this finding was clearly erroneous because no reasonable juror could believe the content of Jackson's testimony given the incredible manner in which it came about—Jackson was dating defendant's sister at the time of the shooting, and they had since had four children together; Jackson waited nearly 40 years to come forward with the fact that he was in the car with Perry when Perry was killed, and all that time he allegedly knew that defendant was innocent; and

---

[9] The prosecution argues in passing that "Jackson's testimony could have easily been discovered before defendant's trial," but the prosecution grounds this argument in the fact that Jackson has four children with defendant's sister. It is not clear, however, why the prosecution believes that this connection would have given defendant a reason to suspect that Jackson may have been present when Perry was shot.

Jackson never explained why he was no longer fearful of coming forward with this information. While the prosecution has a colorable argument, we need not consider it because we conclude that the trial court properly found that, when Jackson's testimony is considered in conjunction with the other evidence that would be presented on retrial, a different result would not be reasonably probable on retrial.

The thrust of defendant's argument on appeal is that the trial court erred by finding that a different result would not be reasonably probable on retrial because Kirk's identification of defendant was questionable, so the trial court should have placed less weight on that evidence and given more credence to Jackson's testimony. While there were undoubtedly problems with Kirk's identification of defendant, it was not as questionable as defendant claims.

Defendant first assails Kirk's identification of defendant by arguing that eyewitness identifications are unreliable as a general matter, but Kirk provided a more-than-sound basis for his eyewitness identification of defendant. Kirk testified that he had known defendant for eight or nine years, they lived in the same neighborhood, and Kirk saw defendant "probably 200 times during the year" and saw defendant's "car on a consistent basis probably daily." Kirk was able to identify defendant's car before the chase because it drove in front of Kirk's car at least twice before parking. Kirk also testified that he was able to discern that defendant was driving the car, and as he continued watching the car, he saw defendant park the car, get out of the car, and get a gun from the car's trunk before Kirk drove off. There is also no dispute that, when defendant's car stopped across from Kirk's car following the shooting, the lighting was sufficient to allow Kirk to see that it was defendant looking at Perry's body from the passenger seat of defendant's car. Kirk testified that, despite the late hour, the combination of the streetlights and the dome light from his car (which was on because the driver's door was still open after Kirk fled) was enough for Kirk to clearly see that the individual looking at Perry's body was defendant.

Defendant on appeal also overstates the problems with Kirk's identification of defendant as the shooter when he asserts that Kirk "initially failed to identify defendant as the shooter." The record suggests otherwise. Kirk was brought in on August 8—two days after the shooting—to identify the person he saw chasing them in a car, and Kirk tentatively identified defendant from a photo lineup. While Kirk said that he was only "85 per cent sure that" defendant was the person he saw that night, Kirk's identification of defendant was consistent with what he told officers immediately following the shooting.

Kirk testified that he told officers on the night of the shooting that he knew "the assailant," and he "gave them a street that [he] thought that the defendant lived on and a description of" defendant's car. The officer who spoke to Kirk at the scene confirmed that Kirk gave him a description of a vehicle matching defendant's vehicle. The officer also testified that Kirk told him that one of the two occupants of the car "had a girlfriend that lived"

near the party store Kirk came from, and other testimony confirmed that defendant's girlfriend at the time lived near the party store where Perry got into Kirk's car.[10]

Kirk's identification of defendant's car—which defendant described to officers on the night of the shooting and later identified on August 8—is also significant because it was confirmed by Billie Fortune, who witnessed the end of the car chase and its aftermath. At defendant's trial, Fortune testified that, on the night of the shooting, he saw two cars that appeared to be racing each other—a Ford Thunderbird (which matched the description of Kirk's car) and a gold Cadillac[11] with a dark roof (which matched the description of defendant's car). Fortune followed the cars and tried to catch up to them because he thought his car "would be a better race" for the Cadillac. As he did so, Fortune "noticed that one of the cars disappeared," and he then came upon the Thunderbird "sitting upon the curb."[12] Fortune drove by slowly and saw "a man in there slumped over with blood all over him." Fortune also saw the driver's door open, and watched a man run around the car and down the street. As Fortune continued driving, he saw the Cadillac in front of him and watched as it performed a U-turn. Fortune then also performed a U-turn and saw the Cadillac stopped across the street from the Thunderbird. As Fortune drove back towards the cars, the Cadillac drove off, and Fortune saw "[t]he man that had jumped out, he was coming back towards the car." Fortune then left to find a phone to call the police, but he could not locate a working payphone, and when he went back to the scene, "the police were there," and he gave a statement to an officer.

Kirk's and Fortune's statements to officers on the night of the shooting led officers to defendant's address to look for a car matching the description of defendant's car. Those officers testified that they went to defendant's street because officers at the scene of the shooting radioed that the owner of the car that was involved in the shooting "was supposed to live on" that street. This led the officers to be, in their words, "planted" (meaning stationary) on defendant's home from approximately 11:20 p.m. on August 6 to 1:45 a.m. on August 7 searching for the vehicle that was described to them, but they were unable to locate the car. So, the officers returned to the station, then went back out to defendant's street at around 2:45 a.m. This time, the officers saw defendant's car parked on the street in front of his home. As the officers drove by, they saw three individuals on the porch of defendant's home, and one of the officers recognized defendant as one of the individuals on the porch because the officer had seen defendant "several times in the past, driving the vehicle that was described to [the officer], which was now parked there." Upon seeing

---

[10] On the night of the shooting, Kirk told officers that "Blue Bay" was the assailant, and Kirk explained at trial that "Blue Bay" was not defendant but defendant's friend whom Kirk confused with defendant when Kirk first talked to the police. Kirk claimed that he initially misspoke because he was distressed and not thinking clearly after witnessing Perry being killed.

[11] At trial, Fortune testified that he thought that the Cadillac was red, but he confirmed that he told officers on the night of the shooting that the Cadillac was gold with a dark roof, and he further confirmed that this "changed [his] mind about the color of the car."

[12] Fortune did not hear any loud noises or see any guns on the night of the shooting.

the officers, the three individuals fled inside the home, and when the officers tried to gain entry, those inside barricaded the door while defendant fled out a window.

Defendant focuses on the fact that, during the live lineup on August 16, Kirk initially identified someone other than defendant as the shooter, and he only picked defendant out of the lineup after talking with the officer in charge of the investigation. This identification—particularly the officer's conduct surrounding the identification—was undoubtedly problematic. Indeed, it was so problematic that the prosecution conceded on direct appeal that the identification was the result of a suggestive lineup. But Kirk testified that he purposefully picked the wrong person out of the lineup out of fear,[13] and Kirk's initial misidentification on August 16 does not otherwise undercut all of the evidence connecting defendant to the shooting up to that point. To reiterate, Kirk gave officers a description of defendant's car (a description that was independently corroborated by Fortune) on the night of the shooting; Kirk told officers where they could find the car, which was the street and address where defendant resided; Kirk told officers that one of the occupants of the car had a girlfriend that lived where defendant's girlfriend lived; and Kirk later tentatively identified defendant in the photo lineup on August 8 (the same day that he identified defendant's impounded car). Additionally, when officers found defendant's car on the basis of the information that Kirk gave them, one of the officers saw defendant on the porch of the house that the officers had been watching, and that officer recognized defendant because he had seen defendant "several times in the past, driving the vehicle that" the officers were looking for. While much of this is circumstantial evidence tying defendant to the crime through his vehicle, it nevertheless suggests that Kirk's identification of defendant was not as shaky as defendant contends.

More generally, this and other circumstantial evidence tying defendant to Perry's murder supports the trial court's conclusion that, considering Jackson's testimony in conjunction with the evidence that would be submitted at retrial, a different result was not reasonably probable. While the trial court said that it had "carefully considered . . . the evidence that was submitted at defendant's trial," the court did not explicitly address much of this evidence in its order. The court focused only on the facts that (1) defendant "had twice attempted to harm" Perry due to their "ongoing dispute" (though the court did not note that, in one of those instances, defendant tried to shoot Perry with a rifle) and (2) when police went to apprehend defendant immediately after the shooting, "the home was barricaded and defendant fled" (which, while not stated by the court, supports an inference of "consciousness of guilt," see *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003)). The court also did not explicitly address the concerns with Kirk's credibility during its discussion of the fourth *Cress* factor,[14] nor did the court address some serious inconsistencies between Jackson's testimony and evidence that was presented at defendant's trial.

---

[13] Kirk claimed at defendant's trial that he was receiving threats to prevent him from identifying defendant from both people associated with defendant (who wanted defendant to go free) and people associated with Perry (who wanted to kill defendant themselves). According to Kirk, defendant's brother was one of the people threatening to harm Kirk before the August 16 lineup.

[14] While the trial court did not explicitly address the concerns that defendant raised with Kirk's credibility, we think it plain that the court considered this issue. The court was clearly aware of problems with Kirk's identification of defendant during the live lineup because the court discussed

On that latter point, the trial court never addressed how Jackson's testimony conflicted with Fortune's testimony. Fortune confirmed Kirk's description of the vehicle that was chasing Kirk—a gold Cadillac with a dark roof. Jackson, on the other hand, testified that Johnson was chasing them in a red and white Buick.[15] More significantly, Fortune testified about what he saw after Kirk's car crashed—a single individual getting out of the driver's door and running away. Fortune lingered in the area for some time; he testified that he slowly drove past Kirk's car, saw Perry's body, then pulled a U-turn to continue viewing what was happening around Kirk's car. But at no point did Fortune testify to seeing a second individual fleeing from Kirk's car. Fortune's testimony thus not only corroborates Kirk's testimony, but it seriously undermines Jackson's contention that he was in Kirk's car with Perry on the night of the shooting and fled the scene after Perry was shot.

To recap, the prosecution did not have a weak case against defendant. While Kirk's testimony was the only evidence directly tying defendant to the crime, Fortune's testimony tied defendant's vehicle to the crime. And while there were significant problems with Kirk's identification of defendant at the August 16 live lineup, other evidence supported that Kirk had consistently identified defendant as the shooter. Most significantly, on the night of the shooting, Kirk provided officers with a description of a person matching defendant, and he told officers where they could find this person and their car. Kirk's description of the car was the same as Fortune's description of the car, and defendant's car fit those descriptions. Kirk's statement to the police led officers to defendant's street, and when officers finally located defendant's car in front of his home, one of the officers saw defendant on the porch. But when the officers attempted to apprehend defendant, his home was barricaded and defendant fled. Kirk later tentatively identified defendant as the perpetrator in a photo lineup, and he positively identified defendant's car. The evidence also established that defendant had an ongoing dispute with Perry that had escalated to the point where defendant had previously shot at Perry with a rifle, and Perry was killed by a .30-caliber bullet fired from a rifle. While much of this evidence is circumstantial, it all supports that defendant shot and killed Perry on the night of August 6, 1984.

On retrial, the jury would hear this evidence and would have to consider it in conjunction with Jackson's testimony offering a differing account of who killed Perry. Ignoring for the moment the incredible manner in which Jackson's testimony came about, any impact of Jackson's

---

those problems at length earlier in its order. And defendant argued below that the trial court should discount Kirk's identification of defendant because Kirk identified someone other than defendant during the August 16 live lineup. Given defendant's argument and the fact that the court discussed the factual basis for defendant's argument in its order, it would be akin to placing form over function to conclude that the trial court failed to consider problems with Kirk's identification of defendant during the live lineup (the only issue with Kirk's credibility that defendant has raised) because the court did not explicitly say that it was doing so. But even if it was error for the trial court to not explicitly address this issue, the error was harmless.

[15] As stated earlier, Fortune initially testified that the car chasing Kirk was red, but upon hearing that he told officers on the night of the shooting that the car was gold with a dark roof, Fortune confirmed that he "changed [his] mind about the color of the car." Also, notably, Fortune never wavered on the fact that the chasing vehicle was a Cadillac because he knew "that engine" as he was "somewhat" of "a hot rodder."

testimony is significantly lessened by the fact that his testimony is inconsistent with the testimony of the only witness who observed the car chasing Kirk's vehicle—Fortune. Again, Fortune identified the car chasing Kirk's vehicle on the night of the shooting as a gold Cadillac with a dark roof (not a red and white Buick, as Jackson attested), and, significantly, Fortune only saw one person flee the vehicle after it crashed, undermining Jackson's claim that he was also in the car on the night of the shooting and fled after Perry was shot. Given the relative strength of the prosecution's case, we conclude that it was not outside the range of reasonable and principled outcomes for the court to conclude that Jackson's testimony would not make a different result reasonably probable on retrial. Cf. *Johnson*, 502 Mich at 576-577 (holding that, because the "defendants' convictions were based on shaky grounds," the witness's testimony offering a different version of events made a different result reasonably probable on retrial).

This is true regardless of the incredible nature in which Jackson's testimony came about, but this conclusion is certainly bolstered if that fact is considered. As the trial court observed, if a retrial took place, the jury would hear about how Jackson was dating defendant's sister at the time of the shooting and has since had four children with her; how Jackson waited nearly 40 years to come forward with information that would have exonerated his children's uncle of a crime for which he was supposedly wrongfully convicted; how Jackson never told defendant's sister—the mother of Jackson's children—that he knew who actually committed the crime for which her brother was convicted because "[i]t never came up" (despite the fact that defendant's sister testified at defendant's trial); how Jackson claimed that he only told this information to his mother and brother, then said that he actually only told his mother and that his brother may have overheard it, and then said that he also told his daughter because he "had to"; and how Jackson was unable to say what had changed to make him come forward after nearly 40 years.[16] If this evidence is considered, then the impact of Jackson's testimony at retrial would be seriously diminished, so Jackson's testimony would clearly not make a different result on retrial reasonably probable.

But our conclusion is the same even ignoring the incredible manner in which Jackson's testimony came about for the reasons explained above. That is, considering the relative strength of the prosecution's case and the fact that Jackson's testimony is significantly undermined by Fortune's testimony (which actually corroborated Kirk's testimony that defendant's car was involved in the chase), the trial court's decision to deny defendant's motion for relief from judgment was within the range of reasonable and principled outcomes.

Affirmed.

/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien

---

[16] We also note that, while not recognized by the trial court, Jackson's affidavit appears internally inconsistent. Jackson averred that he saw "Johnson retrieve a *rifle* from the trunk" but "the rear window [of Kirk's car] was shattered with a *shotgun* blast." (Emphasis added). Additionally, at defendant's trial, it was established that Perry was killed by a .30-caliber bullet fire from an "M-1 Military Style Carbine," which is "a rifle," not a shotgun.